UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No.:  19-10117-IT-6 |
| (6)   FELICITY HUFFMAN, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM CONCERNING DEFENDANT FELICITY HUFFMAN

The government respectfully submits this supplemental memorandum in connection with the sentencing of defendant Felicity Huffman.

Under the Sentencing Guidelines, Huffman's advisory Guidelines range is zero to six months of incarceration, in addition to supervised release and a fine.  For the reasons set forth below and in the government's Consolidated Sentencing Memorandum, the Court should sentence Huffman to a term of one month of incarceration, followed by 12 months of supervised release and a fine of $20,000.[1]

### I.     Background

The essential facts of Huffman's criminal activity are not in dispute:  She agreed with a co-conspirator, William "Rick" Singer, to pay $15,000 to have another co-conspirator purport to proctor her daughter's SAT exam, but in fact correct the daughter's answers and thereby

---

[1] As to any fine ordered by the Court, the government is trying to arrange for those amounts to be applied to federal government programs supporting educational opportunities for under-privileged Americans.  The issue is complicated by the Anti-Deficiency Act and certain other federal regulations.  If the Court does impose a fine, the government respectfully requests 30 days to submit a proposed order concerning disposition of the fine proceeds.

fraudulently inflate the score.   In so doing, she defrauded both the College Board and the Educational Testing Service ("ETS"), the non-profit organizations that develop and administer the SAT.   And because she intended for her daughter to submit the fake scores as part of college applications, she likewise sought to defraud the colleges to which her daughter applied and to deprive competing applicants of a fair shot at admission.   In the process, she also misled her daughter, who was unaware of the scheme, and her daughter's high school where, but for Huffman's actions, the SAT would have been administered by a legitimate proctor.

Huffman's decision to cheat was deliberate and knowing.   Her own contemporaneous notes—which she took on her laptop computer following an August 2017 meeting with Singer at her home—reflect her understanding that for "15 grand," Singer could "[c]ontrol the outcome of the SAT."[2]   She wrote:   "get a proctor in the room with her and she gets the answer she needs to get[.]   At the end of the test – the proctor makes sure."   And, she noted, for "75 grand guy will make the scores perfect."

Huffman's notes also show that she knew what she was doing was wrong, and she conspired with Singer to avoid arousing suspicion.   She wrote:   "If we start taking it multiple time – college board will only allow you a certain amount of increase – between tests – they would investigate you."   For her older daughter, who had already taken the PSAT ten months earlier, Huffman chose the $15,000 option, that is, she decided to buy an improved score, but not a perfect

---

[2] Huffman produced the notes to the government in connection with a disagreement about the amount of the payment Huffman agreed to make to facilitate the bribe scheme.   They are submitted herewith under seal as Exhibit A.   In making its sentencing recommendation, the government has accepted Huffman's representation, as reflected in the notes, that she understood the agreed-upon payment to be $15,000.   It has, accordingly, reduced its recommended sentence from four months, as set forth in the plea agreement, to one month—near the low end of the agreed-upon range.

one.  With respect to her younger daughter, she wrote:  "If we decide to do it – don't do PSAT's – just take SAT in October."

Over the next several months, Huffman took multiple steps to facilitate the scheme.  Just days after Singer instructed her, at their August 2017 meeting, to "insist" that her daughter receive 100 percent extended time to take the exam over multiple days, she directed a psychologist to contact the College Board to secure that approval.  While the psychologist had concluded that Huffman's daughter did, in fact, qualify for extended time due to a learning difference, this step was critical to enable the next step in the plot:  switching the test location from her daughter's high school—where it would be legitimately proctored—to a test center in West Hollywood, California that Singer "controlled" through another co-conspirator, Igor Dvorskiy.

And when Huffman later learned that, despite the grant of extended time, her daughter's high school still intended to have its own proctor administer the SAT, she emailed Singer with obvious alarm:  "Ruh Ro!  Looks like [the high school] wants to provide own proctor."

Thereafter, Huffman agreed with Singer to lie to the high school guidance counselor by falsely telling the counselor that her daughter would take the test elsewhere over a weekend so that she would not have to miss any school.  The *sole purpose* of that lie was to enable the corrupt proctor, Mark Riddell, to correct her daughter's answers at the test center operated by Dvorskiy, the corrupt administrator.  And Huffman went further:  calling ETS directly to confirm that the exam would be shipped to Dvorskiy, and not to her daughter's high school.

In February 2018, after learning that the scheme had succeeded in improving her daughter's score by about 400 points, Huffman reimbursed Singer for the costs of paying Riddell and bribing Dvorskiy by making a purported contribution of $15,000 to Singer's sham charitable organization, the Key Worldwide Foundation ("KWF").

One year later, having succeeded in cheating once, Huffman took steps to cheat again, this time for her younger daughter.  Over the course of multiple calls, she and Singer reviewed the mechanics of the scheme, and how to pull it off without alerting her daughter's SAT tutor.  For example, the following is an excerpt from a call with Singer on February 13, 2019, which was consensually recorded:

| | |
|---|---|
| HUFFMAN | And, you know, [the tutor] gave her that practice test, and as I said to you, you know, she came in at around 1200 and she said, "But I think, you know, we can bring that--" |
| Singer | We can go 14-- |
| HUFFMAN | --yeah, we can bring that up."  But I just didn't know if it'd be odd for [the tutor] if we go, "Oh, she did this in-- in March 9th, but she did so much better in May."  I don't know if that'd be like-- if [the tutor] would be like "Wow." |
| Singer | --[the tutor] is just doing her job so I don't think she gets well-engaged in that kind of world. |
| HUFFMAN | Okay. |
| Singer | So I wouldn't worry about that. |

Ultimately, in March 2019, Huffman chose not to pursue the scheme a second time.

## II.     Huffman Should be Sentenced to One Month in Prison, Followed By One Year of Supervised Release and a Fine of $20,000

Huffman's extended effort to defraud the College Board, ETS and the colleges and universities to which her daughter applied, warrants a sentence of imprisonment.  She should be sentenced to a term of one month—within the applicable Guidelines range—followed by 12 months of supervised release and a $20,000 fine.  This disposition is sufficient, but not greater than necessary, to achieve the goals of sentencing, while recognizing Huffman's nearly immediate

acceptance of responsibility, individual circumstances, and culpability relative to her co-conspirators.

Huffman's conduct was deliberate and manifestly criminal: it was wrong, she knew it was wrong, and she actively participated in manipulating her daughter's guidance counselor, the testing services and the schools to which her daughter applied. Her efforts weren't driven by need or desperation, but by a sense of entitlement, or at least moral cluelessness, facilitated by wealth and insularity. Millions of parents send their kids to college every year. All of them care as much as she does about their children's fortunes. But they don't buy fake SAT scores and joke about it ("Ruh Ro!") along the way.

Moreover, while Huffman has publicly expressed remorse for her actions since the time of her arrest, she has more recently submitted a version of the offense conduct to the Court that quibbles with certain details. She contends, for example, that she did not agree to engage in the scheme until October 2017, three months after Singer first proposed it. (PSR ¶ 68.) She suggests that she was not initially aware of the connection between obtaining 100 percent extended time on the exam and enabling the fraud by switching the exam location from her daughter's high school to the corrupt test center. (PSR ¶ 65.) And she argues that "Singer never told her (and she had no knowledge about) his financial relationship with Dvorskiy and Riddell." (PSR ¶ 69.)

The cumulative import of these arguments is to imply that Huffman is somehow less guilty—that she participated in fraud only reluctantly, without fully understanding it. That is false. Huffman is a sophisticated businessperson. She was clearly aware that Riddell and Dvorskiy weren't helping her cheat on the SAT for free. From the first moments of her involvement in the scheme, she knew that for "15 grand" the proctor would "make[] sure" that her daughter "gets the answer she needs to get," while for "75 grand" he would "make the scores perfect." When she

wrote a check to Singer's fake charity to cover the agreed-upon price for the scam, she obviously knew that (a) she was paying for these services while (b) masking the true nature and purpose of the payment.

But the bigger point is this:  even according to Huffman's version of events, her decision to engage in crime was deliberate and considered.  As early as August 2017, she knew that what was on the table was an illicit scheme to corrupt the SAT system.  She thought about it, and decided to commit fraud only after a period of reflection.  This was not some impulsive act.

And, of course, it wasn't a single act at all.  It was a scheme that, as Huffman's own notes make clear, unfolded gradually, over months, requiring her to repeatedly re-commit to deception and fraud.  There were endless opportunities for her to reconsider her participation between August, when Singer proposed the plan, and December, when her daughter took the exam and Riddell corrected it.  And yet she not only pursued the fraud, but actively assisted the effort.  She agreed to manipulate her daughter's high school counselor to facilitate the switch in testing locations.  She personally called ETS to make sure the test was sent to the test administrator whose services she was corrupting through the payment of a bribe.

And after engaging in the fraud once, she committed to it anew for her younger daughter, backing out only in March 2019—more than *18 months* after her August 2017 meeting with Singer.

Huffman also pursued this fraud despite the staggering advantages that she, and so her daughter, already enjoyed by virtue of Huffman's enormous wealth and fame.  She could buy her daughter every conceivable legitimate advantage, introduce her to any number of useful personal connections, and give her a profound leg up on the competition simply because she would be applying to college as the daughter of a movie star.  But Huffman opted instead to use her daughter's legitimate learning differences in service of a fraud on the system, one that Huffman

knew, by definition, would harm some other student who would be denied admission because Huffman's daughter was admitted in his or her place, under false pretenses.  In doing so, Huffman not only fueled skepticism over such diagnoses, potentially making it more difficult for students with legitimate disabilities to obtain the accommodations they need, but also undermined confidence in the college admissions process generally.[3]

Moreover, even as Huffman was taking steps to avoid detection of her fraud, she was affirmatively cultivating, and monetizing, a public persona as a likeable everywoman and trustworthy purveyor of parenting wisdom.  Through a website and blog bearing her nickname, she dispensed "urban mom survival tips" and "hard earned advice from one girl to another."  For example:

> Now that I have been out of school for a thousand years, I realize it wasn't the STUFF in school; the subjects, the facts or the rote knowledge (90% of which I have forgotten) that really impacted me. It was being forced into new situations and subjects and those life lessons that really educated me.
>
> Problem solving, making hard work habitual, learning how to be a good friend, making stupid mistakes, figuring out how much of a "yes" is in that "no," learning how the power system works and how to make it work for me; were my true education. . . .
>
> This is all to say, I salute and celebrate kids for walking into a building every day full of the unknown, the challenging, the potential of failure and the constant question, "Why am I doing this?"

---

[3] *See, e.g.*, https://www.insidehighered.com/admissions/article/2019/03/14/advocates-students-learning-disabilities-fear-impact-admissions.  As the Learning Disabilities Association of America has noted, "These actions hurt all individuals with disabilities, including those with learning disabilities, by perpetuating the misperceptions that many students who obtain accommodations on college admissions do not have disabilities and that this abuse is widespread." *Id.*

> Maybe we all need to show up for the first day of 2nd grade. It's good to step out and be scared, to not know the answer. It sure makes me feel alive, awake and expands me.[4]

The subtext of this passage, and others like it, is that parents should tell their children to take a forthright approach to life's challenges, tackling the ups and downs with perspective and integrity. But at the very same time that she was extolling the virtues of imperfection and the "potential of failure," Huffman was paying corrupt testing officials to cheat on her daughter's SAT, an effort that involved manipulating her own daughter along with everyone else.

Huffman's parenting website—which has been taken down since her arrest—was not designed simply to maintain a public image at odds with her private reality. It was a business. She sold advertising on the site and also used it to sell t-shirts, mugs and trinkets bearing inscriptions like "Good Enough Mom" and "Mom Knows Best."[5] In short, while her recent expressions of regret are commendable, in real time she profited from fundamental duplicity.

Finally, other considerations also support the government's proposed sentence of one month of incarceration. In the context of this case, neither probation nor home confinement (in a large home in the Hollywood Hills with an infinity pool) would constitute meaningful punishment or deter others from committing similar crimes. Nor is a fine alone sufficient to reflect the seriousness of the offense or to promote respect for the law. Even a fine at the high end of the applicable Guidelines range would amount to little more than a rounding error for a defendant with a net worth measured in the tens of millions of dollars. *See, e.g., United States v. Zukerman*, 897 F.3d 423, 431 (2d Cir. 2018) ("A fine can only be an effective deterrent if it is painful to pay, and

---

[4] *See* "Felicitations for September: Happy New Year," *available at* https://web.archive.org/web/20180118102954/http://whattheflicka.com:80/felicitations/2015/.

[5] *See* "What the Flicka?" *available at* https://web.archive.org/web/20190205010342/https://cznd.co/collections/what-the-flicka.

whether a given dollar amount hurts to cough up depends upon the wealth of the person paying it."), *cert. denied* 139 S. Ct. 1262 (2019).  Likewise, community service, especially for the famous, is hardly a punishment—which is why many *non*-felons gladly perform it in the absence of court orders.

The government's recommended sentence of incarceration for a term of one month is sufficient but not more than necessary to achieve the goals of sentencing.  It would provide just punishment for the offense, make clear that this was a real crime, causing real harm, and reinforce the vital principle that all are equally subject to the law regardless of wealth or position.

## Conclusion

For all these reasons, the government respectfully requests that the defendant be sentenced to a term of incarceration of one month, a fine of $20,000, and 12 months of supervised release.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:     */s/ Eric S. Rosen*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date:  September 6, 2019