# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 19-10117 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FELICITY HUFFMAN, | ) | |
| *Defendant* | ) | |

## I.    INTRODUCTION

On March 12, 2019, the FBI arrested Felicity Huffman at her home for conspiring to commit mail fraud and honest services mail fraud in violation of 18 U.S.C. §1349. Ms. Huffman pleaded guilty on May 13, 2019. She is remorseful—indeed, deeply ashamed—about what she did. She now respectfully requests that the Court punish her for her crime by imposing a one-year term of probation; 250 hours of community service as a special condition of probation; and the $20,000 fine called for by the Plea Agreement. That sentence is appropriate here for five main reasons:

- *First*, whether the Court adopts the guidelines calculation in the Plea Agreement or the view the Probation Department advances, the proposed sentence falls squarely within the applicable 0 to 6 month guidelines range. A probationary sentence is also consistent with the Sentencing Commission's recent reminder to Courts to "consider non-incarceration sentences for non-violent first offenders." USSG Supplement to Appendix C (Amendment 811), November 1, 2018.

- *Second*, the proposed sentence is consistent with the punishment Judges mete out in similar cases in this District and across the country. Judges almost always impose probationary sentences in cases like these. Imposing the sentence Ms. Huffman requests would serve a primary purpose of federal sentencing law: "avoid[ing] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. 3553(a)(6).

- *Third,* the facts of Ms. Huffman's crime show that she deserves punishment equally as severe as the sentences imposed in similar cases. "Just punishment," *see* 18 U.S.C. 3553(a)(2)(A), requires that—but not more than that.

1

- *Fourth,* Ms. Huffman's conduct here was completely out of character. Nothing about her "history and characteristics" require a prison sentence; in fact, consideration of the life Ms. Huffman has lived points decisively in the opposite direction.

- *Fifth,* the sentence Ms. Huffman proposes best serves *all* the purposes of sentencing recognized in 18 U.S.C. § 3553(a). It is "sufficient, but not greater than necessary" to "reflect the seriousness of the offense, to promote respect for the law . . . to afford adequate deterrence to criminal conduct." *See also United States v. Rodriguez,* 527 F.3d 221, 228 (1st Cir. 2008)

## II.   FACTS

In October 2017, Ms. Huffman agreed to pay Rick Singer $15,000 to falsify her daughter

Sophia's SAT scores. She committed a federal crime when she did so, as her guilty plea acknowl-

edges. But here, as in every case, context—the "the nature and the circumstances of the offense"

—is critical. 18 U.S.C. § 3553(a)(1). Ms. Huffman does not offer this account as a justification or

excuse for what she did. But she asks the Court to take five critical facts into account in evaluating

her actions.

*First*, Ms. Huffman did not seek out Singer because she wanted to falsify her daughter's

*SAT scores.* To the contrary, a friend (a woman not alleged to be involved in any unlawful conduct)

recommended Singer, describing him as one of the best college counselors in California.[1] PSR

¶53. Ms. Huffman sought help from Singer because Los Angeles County High School for the Arts

("LACHSA"), the public high school her daughter Sophia attended, had limited college counseling

resources: two college counselors for more than 600 students. *Id.*

*Second, Ms. Huffman's daughter had significant, long-recognized learning disabilities that*

*legitimately entitled her to extra time on tests.* Ms. Huffman believed it was particularly important

to hire someone to help Sophia prepare for the college testing and application process because of

---

[1] The charging document does not identify either of Ms. Huffman's daughters by name. Because both her daughters' names have been widely publicized in the media, Ms. Huffman uses them here for purposes of clarity.

2

her daughter's long-diagnosed learning disabilities. *See* Exhibit A (Felicity Huffman Letter); *see* PSR¶¶52-59. Sophia was granted extra time on tests beginning in middle school. *Id.* In June 2017, before Singer proposed his illegal scheme, a neuropsychologist conducted follow-up testing and recommended that Sophia received 100% time on standardized tests, and that the testing take place over two days. *Id.*

*Third, for nearly a year before suggesting his scheme, Singer provided legitimate educational advice to Ms. Huffman.* Ms. Huffman first spoke to Singer in September 2016. *Id.* ¶54. Sophia had just started her sophomore year at LACHSA and Mr. Huffman's younger daughter, Georgia, was starting her freshman year at another school. *Id.* ¶ 55. Singer agreed to work with Sophia. *Id.* ¶54. He said nothing suggesting that he could increase Sophia's SAT scores at will; indeed, just the opposite: Ms. Huffman came away from her first meeting with Singer understanding that Sophia would need to study hard to prepare for the SATs. *Id.* Between September 2016, when Ms. Huffman first spoke with Singer, and eleven months later, in August 2017, when he first proposed falsifying test results, Singer gave Ms. Huffman a broad range of completely legitimate advice about her two daughters' educations. *Id.* ¶55. His company provided tutors for Sophia and Sophia worked hard to improve her scores. *Id.* ¶56. Singer also gave Ms. Huffman advice about her younger daughter, Georgia, and even met with senior officials at Georgia's high school (Georgia was then a sophomore) to advocate for an academic program that took Georgia's learning disabilities into account. *Id.* ¶57. By August 28, 2017, when Singer first proposed his scheme, Ms. Huffman's confidence in him had grown and she had come to rely on him as the primary source for guidance for both her daughters' educations. *Id.* ¶55.

*Fourth, Ms. Huffman did not immediately agree to Singer's illegal proposal to falsify test scores.* Singer first proposed his illegal scheme to Sophia on August 28, 2017, nearly a year after

3

he began working with Ms. Huffman and her daughters. *Id.* ¶60. Ms. Huffman took notes of that meeting on her laptop. At the meeting Singer stressed the importance of Sophia getting good test scores *Id.* He also recommended that Sophia have math tutoring twice a week. *Id.* But Singer also described his views of how the college admissions process really worked. *Id.* He said Sophia would have to compete with many other students who had advantages in the admissions process she would not: athletes and children of alumni, for example, and children who got into college because their parents had made major donations to the school. *Id.* Even if a school's stated admissions rate was 10%, Singer said, its actual rate for a student like Sophia, who was not a legacy, an athlete, or the child of a major donor, might be two or three percent. *Id.*

Sophia wanted to study performing arts (acting, in particular) at college. *Id.* ¶61; *see also* Exhibit A (Felicity Huffman Letter). To be admitted, Singer explained, Sophia would need to audition in person and be selected based on acting ability and promise. PSR ¶61. But Singer also told Ms. Huffman that Sophia's talent alone would not be enough. *Id.* Singer said Sophia needed to get a score of 1250 to 1350 on the SAT to even be considered for the performing arts programs she hoped to attend. *Id.* Without a score in that range, Singer said, Sophia would be rejected no matter how much ability she showed in an audition. *Id.* (Ms. Huffman did not know at the time, but learned later, that this was false: several of Sophia's classmates, also talented performers with no special advantages in the admissions process, were admitted to schools on Sophia's college list with SAT scores in the 1100s. *Id.*)

Singer then proposed the scheme that brings Ms. Huffman here. *Id.* ¶62. As Ms. Huffman's contemporaneous notes recite, Mr. Singer said he could do what he perversely described as leveling the playing field. He proposed to:

4

> Control the outcome of the SAT—15 grand—get a proctor in the room with her
> and she gets the answer she needs to get[.] At the end of the test—the proctor is
> making sure. 75 grand guy will make the scores perfect.

*Id*. Singer told Ms. Huffman that he had done the same with many other families. *Id.* ¶63

Ms. Huffman did not immediately agree to Singer's proposal. *Id.* ¶64. Instead, Ms. Huffman followed through on Singer's alternative suggestion—that he provide a new math tutor. Sophia worked with that math tutor in September and October. *Id.* ¶65. On October 16, 2017, the College Board notified Sophia and LACHSA that Sophia had been granted 100% extra time on the SAT, as her neuropsychologist had recommended and requested based on the updated testing conducted in June. *Id.* ¶66. LACHSA informed Ms. Huffman that her daughter could take the exam at the school on December 4-5, 2017. *Id.*

LACHSA's offer to permit Sophia to take the exam over two days at the school effectively required Ms. Huffman to make the decision she had been putting off. Should she have Sophia take the test at LACHSA with the benefit of the accommodations she had legitimately obtained—100% extra time, with the test to be taken over two days? Or should she accept Singer's proposal to inflate the test scores—something that required Sophia to take the test at a testing center Singer controlled? Ms. Huffman spoke with Singer. *Id.* ¶67. He told her that he believed Sophia's test preparation work and the accommodations she had legitimately received would not be enough. Without his help on the test scores, Singer said, Sophia would be rejected even if she performed well in her auditions. *Id.*

On October 17, 2018, to her deep and continuing shame, Ms. Huffman agreed to the proposal Singer had first made on August 28. *Id.* ¶68. She texted Singer, telling him that she wanted Sophia to take the SAT in December. Singer responded: "Are we doing this on her own or with my help." Ms. Huffman replied: "With your help." *Id.*

Why did Ms. Huffman agree to Singer's proposal—one she knew was wrong? Ms. Huffman's letter to the Court (Exhibit A) answers that question in her own words:

> I honestly didn't and don't care about my daughter going to a prestigious college. I just wanted to give her a shot at being considered for a program where her acting talent would be the deciding factor. This sounds hollow now, but, in my mind, I knew that her success or failure in theater or film wouldn't depend on her math skills. I didn't want my daughter to be prevented from getting a shot at auditioning, doing what she loves because she can't do math . . . . I talked myself into believing that all I was doing was giving my daughter a fair shot.

Ms. Huffman does *not* expect the Court to accept that explanation as a justification for her crime. She writes: "I see the irony in that statement now because what I have done is the opposite of fair." *Id*. But that is how Ms. Huffman justified her actions *to herself* at the time, and sheds light on how a person with a strong moral compass could wander so far off course. Singer reinforced Ms. Huffman's rationale. As he told Ms. Huffman in a recorded meeting on October 16, 2018, after Sophia had begun applying to colleges: "$15,000 investment, she got a 1420, which is huge. No school can say no to her based on scores. *Now it's about ability*. That was a smart move." (emphasis added). *See* Exhibit B, Affidavit of Martin F. Murphy ¶3.[2]

---

[2] The government notes that Sophia's SAT score (after Riddell corrected her exam) was approximately 400 points higher than the PSAT score she obtained when she took the PSAT a year earlier. PSR ¶42. This is true as far as it goes, but it does not tell the whole story. When Sophia took the PSAT in October 2016 (near the start of her sophomore year), she received no accommodations of any kind—including the extra time she was entitled to. In addition, Sophia had not taken her ADHD medication that day. *Id*. ¶52. And since neither Ms. Huffman nor her daughter attached any significance to the PSAT, as they understood it to be only a prep test, Sophia did nothing to prepare for it. *Id*. Ms. Huffman does not know what her daughter's December 2017 SAT scores were *before* Singer's accomplice, Riddell, corrected Sophia's answers. The government has offered no evidence of that. But it is unfair to Sophia to assume that her score on the December 2017–before Riddell's corrections–was in fact 400 points lower than 1420. Moreover, whatever her true score was, that score likely failed to reflect what Sophia's performance would have been if she had taken the test as she was legitimately entitled to take it: with 100% extra time, over a two-day period—something that Sophia's neuropsychologist had recommended and the College Board approved. *Id*. ¶70.

*Fifth, Ms. Huffman consciously chose <u>not</u> to participate in Singer's scheme a second time.* Singer continued to act as a college counselor for Ms. Huffman and her daughters for more than a year after Sophia took the SAT. *Id.* ¶72. He gave feedback on schools Sophia was thinking about. *Id.* He provided an SAT tutor for Georgia. *Id.* ¶72. Singer also proposed to repeat his scheme by having a proctor falsely inflate Georgia's test scores, and to charge Ms. Huffman $15,000 to do so. *Id.* ¶73. Ms. Huffman seriously considered the proposition. *Id.* She struggled with the idea that she would do something to help one of her daughters and not the other. *Id.* But Ms. Huffman knew that what she had done with Sophia was wrong, and did not want to do a second time something that she remained deeply troubled about having done the first time. *Id.* ¶74. In a call the government recorded on March 5, 2019—before she knew anything about the government's investigation or Singer's cooperation—Ms. Huffman told Singer she was "not going to go the same route with Georgia as we did with Sophia. It just doesn't feel right." Murphy Aff. ¶4.

## III.   MS. HUFFMAN'S ACCEPTANCE OF RESPONSIBILITY

Ms. Huffman promptly accepted responsibility for the crime she committed, agreeing on April 4, 2019 to plead guilty to the Information the government would file on April 8, 2019. She also issued a public statement taking full responsibility for what she had done.[3] In her letter to the Court, Ms. Huffman makes clear how deeply sorry she is for what she did.  *See* Exhibit A.

---

[3] *See* https://www.bostonglobe.com/metro/2019/04/08/read-felicity-huffman-statement-pleading-guilty-college-admissions-scandal/bR55YbqsizzrjnJiPqFOCN/story.html

B5037375.3

IV.     SENTENCING GUIDELINES CALCULATION

The government, Ms. Huffman, and the Probation Department agree that the relevant sentencing guidelines range is 0 to 6 months, although they arrive at the range by slightly different logic. In the Plea Agreement, the government and Ms. Huffman identified USSG §2B1.1 as the relevant guideline. Plea Agreement (Doc. No. 318) ¶ 3. The parties also agreed that §2B1.1's base offense level should be adjusted upward to account for the amount Ms. Huffman agreed to pay Singer. *Id.* The plea agreement left that amount unresolved. The government contended that Ms. Huffman initially agreed to pay Singer $25,000. *Id.*; *see also* PSR ¶ 35. Ms. Huffman disputed that allegation because she agreed to pay, and did pay, $15,000. Plea Agreement (Doc. No. 318) ¶ 3; PSR ¶ 60. The government, which bears the burden of proof on loss enhancement, has informed defense counsel that it does not intend to press the issue and the government's September 13 submission to Probation confirms that. Thus the government and Ms. Huffman (pursuant to the terms of the Plea Agreement) have agreed that the adjusted offense level is 7, resulting in a sentencing guidelines range of 0 to 6 months.[4]

The Probation Department likewise concludes that the sentencing guidelines range is 0 to 6 months. PSR, at 41. The Probation Department determined that Ms. Huffman's conduct caused no loss and, therefore, found that that her adjusted offense level is five, also resulting in a 0 to 6

---

[4]The math is as follows: Base Offense Level=7 (*see* §2B1.1(a)(1)); *plus* 2 because the amount paid was between $6,500 and $15,000 (*see* §2B1.1(b)(1)), *minus* 2 because Ms. Huffman accepted responsibility (see §3E1.1), resulting in an adjusted offense level of 7.

B5037375.3

month range under the guidelines.[5] *Id.* ¶90. Thus, whether the Court adopts the guidelines calcu-

lation in the plea agreement or the Probation Department's calculation, the result is the same: a

guidelines range of 0 to 6 months.[6] The PSR also reports that "[t]he probation officer has not

identified any factors that would warrant a departure from the applicable sentencing guideline

range." *Id.* ¶166.

## V.   THE COURT SHOULD IMPOSE A SENTENCE OF PROBATION WITH SIGNIFICANT COMMUNITY SERVICE

Ms. Huffman respectfully requests that she be sentenced to a one-year term of probation,

with a 250 hours of community service as a special condition of probation, and the $20,000 fine

called for by the Plea Agreement.[7] That sentence represents "just punishment" for her crime, taking

into account "the nature and circumstances of the offense" and Ms. Huffman's "history and char-

acter." 18 U.S.C. § 3553(a). It is "sufficient, but not greater than necessary" to "reflect the serious-

ness of the offense [and] to promote respect for the law." *Id*. Under the circumstances, it "afford[s]

---

[5] The Probation Department's math is as follows: Base Offense Level=7 (*see* §2B1.1(a)(1)), *minus* 2 be-
cause Ms. Huffman accepted responsibility (see §3E1.1), resulting in an adjusted offense level of 5.

[6] In several other cases, the government has taken the position that the correct guideline is USSG §2B4.1
(Bribery in Procurement of Bank Loan and Other Commercial Bribery). *See United States v. Vandemoer*,
19-cr-10079-RWZ (Doc. No. 21); *United States v. Bizzack*, 19-cr-10222-DPW (Document No. 2 (Plea
Agreement)). Applying that guideline would also produce at 0 to 6 month GSR. Under §2B4.1, the math is
as follows: Base Offense Level=8 (*see* §2B4.1(a)); *plus* 2 because the "value of the bribe" was between
$6.500 and $15,000 (*see* §§ 2B4.1(b)(1)(B), 2B1.1(b)(1)); *minus* 2 because Ms. Huffman accepted respon-
sibility (see §3E1.1), resulting in an adjusted offense level of 8. The fine range under the guidelines varies
slightly depending on whether the Court adopts the Probation Department's calculation (a fine range of
$500 to $9,500), *see* PSR ¶162, USSG §5E1.2(c)(3); the calculation in the plea agreement (a fine range of
$1,000 to $9,500), USSG §5E1.2(c)(3), or the calculation under §2B4.1 (a fine range of $2,000 to $20,000).
Here, the government and the defendant agreed to recommend a $20,000 fine.

[7] Ms. Huffman has arranged to perform that community service, should the Court and the Probation De-
partment approve at two Los Angeles area non-profits devoted to serving at risk young people. *See infra*
at 27-28.

adequate deterrence to criminal conduct." *Id.* And it would also "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.*

**A.** **The Proposed Sentence is Permissible Under the Guidelines. Indeed, the Sentencing Commission Has Recently Reminded Sentencing Judges to Consider Probationary Sentences.**

The proposed sentence falls squarely within the sentencing guidelines, which calls for a sentence within the 0 to 6 month range. The guidelines specifically authorize the Court to impose a sentence of probation for defendants, like Ms. Huffman, who are first offenders and whose guidelines range falls within Zone A—the lowest zone in the sentencing table. PSR ¶157; USSG §5B 1.1; *see also* §5B (Introductory Comment): "The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself." To reinforce this point, the Sentencing Commission has recently amended the guidelines "as a reminder to consider non-incarceration sentences" for nonviolent first offenders like Ms. Huffman. *See* Amendment 811, USSG, Supplement to Appendix C (November 1, 2018). Amendment 811 inserted a new Application Note (now Application Note 4) to the Commentary to USSG §5C1.1, stating:

> If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3). See 28 U.S.C. § 994(j). For purposes of this application note, a 'nonviolent first offender' is a defendant who has no prior convictions or other comparable judicial dispositions of any kind and who did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense of conviction.

This provision implements language in 28 U.S.C §994(j), providing that "[t]he Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than

10

imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence . . ." USSG, Supplement to Appendix C (November 1, 2018).

**B.  The Proposed Sentence is Consistent with Other Sentences Imposed in this District and Nationally for Similar Offenses. Imposing it Would Implement 28 USC §3553(a)(6)'s Directive that Sentencing Judges Avoid Unwarranted Sentence Disparities.**

18 U.S.C. § 3553(a)(6) requires that sentencing courts consider, when imposing sentence, the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Congress' focus on eliminating unwarranted disparities played an essential role in the creation of the Sentencing Commission in the first place. *See* USSG Part 1.3 ("The Basic Approach: Policy Statement.") Even after the Supreme Court made clear that guidelines were advisory, not mandatory, avoiding unwarranted disparity remained an important objective: "it is unquestioned that uniformity remains an important goal of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 107 (2007). The advisory guidelines play a critical role in helping sentencing judges to "'avoid excessive sentencing disparities.'" *Id*. (quoting *United States v. Booker*, 552 U.S. 220, 264 (2005)). *See also United States v. Reyes-Santiago*, 804 F.3d 453, 467 (1st Cir. 2015).

Data from the United States Sentencing Commission show that, in this District and across the country, Judges sentence the overwhelming majority of defendants who plead guilty to charges like the ones at issue to probation rather than prison. That was the case even *before* the Sentencing Commission's recent adoption of Amendment 811, directing courts to consider non-incarceration sentences for first offenders. Ms. Huffman's proposed sentence—one that does not call for imprisonment—is consistent with other sentences for similar cases imposed in Massachusetts and across the nation. The government's proposed sentence would create unwarranted disparities, not avoid

11

them. That is the opposite of what 18 U.S.C. § 3553(a)(6) requires. A review of other sentences also serves a second purpose: it provides valuable insight about how other District Judges have sought to fashion "just punishment" for similarly situated defendants, and counsels strongly in favor of a probationary sentence here.

2. *Sentences in this District.* The statistical analysis by MCM Data Consulting (attached as Exhibit C) reveals that between 2002 and 2018, Judges in the District of Massachusetts sentenced, in total, 127 defendants similarly situated to Ms. Huffman. These defendants, like Ms. Huffman, pleaded guilty to charges governed by USSG §2B1.1; had a guidelines range of 0 to 6 months; and occupied Criminal History Category 1. *Id.* at 7 (Table C). Of those 127 defendants, Judges in this District chose to send only *five* (3.9%) to prison at their sentencing hearings. *Id.* (Table E).[8] The most common sentence by far was probation, imposed on 79.5% of those 127 defendants (n=101). *Id.* (Table C). The Sentencing Commission's data record 19 of the 127 defendants (13.4%) receiving prison terms. *Id.* But 14 of these 19 defendants received "time served" sentences. *Id.* at Table E.[9] For these defendants, the sentencing Judge chose *not* to impose any term of imprisonment beyond that resulting from the defendants' pre-trial detention. As a practical matter, the Judge in these cases imposed the *least* severe sentence he or she could at sentencing.

The Sentencing Commission data does not include docket numbers, but counsel has been able to identify three of the five cases where a District Judge here imposed a term of imprisonment beyond time served.[10] These cases involve markedly different facts than those at issue here:

---

[8] In Table D, these cases are identified as Case Nos. 4, 43, 44, 88 and 94.

[9] In Table D, these cases are identified as Case Nos. 1, 2, 3, 5, 6, 38, 45, 65, 66, 74, 93, 95, 96, and 97.

[10] Counsel for Ms. Huffman has been able to match the descriptions of these cases described in Exhibit C, (Table E) to docket numbers in three of the five cases: case nos. 4, 43, 44. Counsel has not been able to obtain additional information about Case Nos. 84 and 94 from Table E.

- In *United States v. Doxer*, 1:11-cr-102680-DJC, Ex. C (Table E, Case No. 43), the defendant stole his employer's confidential information and provided it to a person he believed to be an agent of a foreign government. The government contended that the defendant wanted the foreign agent to harm a family member in exchange for the provision of trade secrets and that the defendant's chief goal was to benefit a foreign government. Doc. No. 28 at 2-3, 6. The court imposed a sentence of six months' imprisonment.

- In *United States v. Deignan*, 1:13-cr-10205-DPW, Ex. C (Table E, Case No. 44), the defendant, a police officer, submitted fraudulent prescriptions for painkillers at pharmacies using a confiscated license he obtained in the course of his duties. The government recommended a sentence of 10 months' incarceration. The court imposed a sentence of three months' imprisonment based in part on the defendant's abuse of his public position for personal benefit.  Doc. No 35 at 23.

- In *United States v. Randall*, 1:11-cr-10242-RWZ, Ex. C, (Table D; Case No. 4) the defendant, also a police officer, accepted money from an informant in exchange for compromising a pending criminal case, and later lied to federal agents about doing so. Shortly before sentencing, he was detained after he assaulted a blogger who had reported about his case. The Court imposed a sentence of four months imprisonment (90 days beyond what he served pre-trial) and two years of supervised release.[11]

---

[11] The data reported above does not include defendants sentenced in 2019. But District Judges in this District have sentenced a number of Criminal History Category I defendants this year whose guidelines calculations were governed by USSG §2B.1. Their sentences reinforce the conclusion that a probationary sentence is appropriate here. Most notably, USSG §2B.1. governed the guidelines calculations in the cases arising from the elaborate, widely publicized scheme some Massachusetts State Police Officers engaged in to obtain overtime pay for shifts they did not work. These defendants violated their oaths as police officers and violated the public trust, but most received one-day prison sentences (reflecting the time they spent in custody immediately after their arrest). *See United States v. Cesan*, 18-cr-10383-DPW ((PSR guidelines range: 12 to 18 months; sentence: time served—one day; one-year supervised release) (Doc. Nos. 36, 43)); *United States v. Chin,* 18-cr-10384-RGS ((PSR guidelines range: 6 to 12 months; sentence: time served—one day, one-year supervised release including three months home detention) (Doc. Nos. 14, 21)); *United States v. Herman,* 18-cr-10326-RWZ ((guidelines range (as calculated by Court): 6 to 12 months; sentence: time served—one day, one-year supervised release, including three months' home detention) (Doc. Nos. 36, 41); *United States v. McAuliffe,* 19-cr-10056-DJC (guidelines range, as calculated by Court: 6 to 12 months; sentence: time served—one day, one-year supervised release) (Doc. Nos. 35, 38); *United States v. Wilson,* 19-CR-10290 (RGS) ((PSR guidelines range: 10 to 16 months; sentence: time served—one day, two-years supervised release, including six months' home detention) (Doc. Nos. 59, 62). Even the two exceptions—State Police overtime cases where the Court imposed a prison term—support the view that a probationary

13

*3. Sentences Nationally*. National data shows a similar pattern. Between 2002 and 2018, United States District Courts across the nation sentenced 18,516 Criminal History Category 1 defendants who pleaded guilty to crimes governed by USSG §2B1.1 and whose guidelines range was 0 to 6 months. *See* Exhibit C, Table A. The overwhelming majority of those defendants (89.9%) received either no term of imprisonment or "time served" sentences, with probation being by far the most common sentence. *Id.*

*4. Sentences in Other Testing Fraud Cases*. While this case has attracted significant public attention, it is not the first or only highly publicized case where the Department of Justice has prosecuted fraud in connection with standardized tests taking. These cases almost always result in probationary sentences; prison sentences are exceptionally rare.

A. New Jersey.  In 2002, federal prosecutors in New Jersey charged more than 50 defendants with participating in a scheme to defraud ETS by cheating on the Test of English as a Foreign Language ("TOEFL") exam.[12] The defendants were foreign nationals studying at colleges and universities in the United States. *Id.* They paid imposters to take the TOEFL exam in their place. *Id.* Many colleges and universities rely on the TOEFL exam to evaluate the English proficiency of

---

sentence is appropriate here. In both cases, the Court imposed a below-guidelines sentence lower than the government's recommendation. In *United States v. Raftery*, 18-cr-10203-WGY, the defendant obtained more than $50,000 in phony overtime. *Id.* (Doc. No. 28). The guidelines range was 12 to 18 months. *Id.* Judge Young imposed a below-guidelines three month sentence in a case, where the government recommended a six-month sentence. *Id.* (Doc. Nos. 24, 28). In *United States v. Sweeney*, 18-cr-10286-NMG, the guidelines called for an 8 to 14 month sentence; Judge Gorton imposed a two month sentence, half of what the government requested.

[12] *See* "Student Visa Fraud Ring Broken by 58 Arrests, Government Says," New York Times, May 8, 2002, available at  *https://www.nytimes.com/2002/05/08/national/student-visa-fraud-ring-broken-by-58-arrests-government-says.html*;  *"Dozens of Students Arrested Nationwide in English Language Testing Scam," Department of Justice New Release* (May 7, 2002), available at  https://web.archive.org/web/20020604112453/http://www.njusao.org/files/to0507_r.htm; *See also United States v. Al Hedaithy*, 392 F.3d 580, 582 (3rd Cir. 1984).

foreign students seeking admission. The exam is an important part of the F-1 visa process, which requires that students remain enrolled to maintain lawful status in the United States. *Id.* Counsel for the defendant has located Pacer Dockets for 50 defendants arrested in connection with the scheme. Only the ringleader was sent to prison at sentencing. *See United States v. Firas,* 02-cr-404 (D.N.J. 2002) (27 month sentence imposed). Forty-six of these defendants received probationary sentences; one received only a fine; one case was dismissed; and two defendants were sentenced to time served. [13]

Pennsylvania.  In 2015, federal prosecutors in Pittsburgh charged 15 defendants for participating in another highly publicized scheme to defraud ETS and The College Board. [14] The defendants obtained counterfeit Chinese passports and used those passports to impersonate prospective students by taking the SAT, GRE or TOEFL and using the results to apply to colleges and

---

[13]*See United States v. Abdel-Megeed,* 2:02-cr-00404; *United States v. Aiban,* 2:02-cr-00371; *United States v. Alarbash,* 1:02-cr-00364**;** *United States v. Al-Awi,* 3:02-cr-00359*; United States v. Albakeri,* 2:02-cr-00369; *United States v. Alenzi,* 1:02-cr-00368; *United States v. Al-Hajeri,* 1:02-cr-00363; *United States v. Alhajri,* 2:02-cr-00374; *United States v. Alharbi,* 2:02-cr-00403; *United States v. Al- Harmoodi,* 2:02-cr-0038; *United States v. Alhouli,*2:02-cr-00401; *United States v. Alhubaidah,* 2:02-cr-00372; *United States v. Aljebreen,* 2:02-cr-00400; *United States v. Alkaabi,* 1:02-cr-00778; *United States v. Alketbi,* 2:02-cr-00396; *United States v. Alkhail,* 2:02-cr-00394; *United States v. Alkhoori,* 2:02-cr-00376; *United States v. Alkhoori,* 2:02-cr-00377; *United States v. Alkhouri,* 3:02-cr-00360*; United States v. Alkhouri,* 3:02-cr-00355; *United States v. Almahdi,* 2:02-cr-00399; *United States v. Almahmoud,* 3:02-cr-00347; *States v. Almandeel,* 2:02-cr-00390; *United States v. Almansoori,* 2:02-cr-00398; *United States v. Almazidi,* 3:02-cr-00356; *United States v. Almazroa,* 2:02-cr-00378; *United States v. Almutairi,* 2:02-cr-00365; *United States v. Alotaibi,* 3:02-cr-00350*; United States v. Al Qimzi,* 2:02-cr-00388; *United States v. Alsehaim,* 1:02-cr-00380; *United States v. Al-Shammari,* 2:02-cr-00383; *United States v. Al-Shebli,* 3:02-cr-00361; *United States v. Al-Shirrawi,* 2:02-cr-00386; *United States v. Alsugair,* 2:02-cr-00779; *United States v. Altarkait,* 2:02-cr-00381; *United States v. Al-Themairi,* 3:02-cr-00349; *United States v. Al-Tumyat,* 2:02-cr-00384; *United States v. Alyamani,* 1:02-cr-00367; *United States v. Alzaabi,* 3:02-cr-00351; *United States v. Barasheed,* 2:02-cr-00366*; United States v. Daglar,* 1:02-cr-00392; *United States v. Dagler,* 3:02-cr-00348; *United States v. Fazel,* 2:02-cr-00385; *United States* v. *Firas et al.,* 2:02-cr-00404; *United States v. Hany al Hedaithy,* 1:02-cr-00379; *United States v. Khouri,* 1:02-cr-00382; *United States v. Khouri,* 2:02-cr-00375; *United States v. Shami,* 3:02-cr-00357; *United States v. Shahab,* 1:02-cr-00393; *United States v. Tahlawi,* 3:02-cr-00358.

[14]*See* "Fifteen Chinese Accused of Using Test-Taking Imposters for College Admission Exams," New York Times, May 28, 2015,  available at https://www.nytimes.com/2015/05/29/us/15-chinese-accused-of-using-test-taking-impostors-for-college-entrance-exams.html.

graduate schools in the United States. *See United States v. Han Tong et al.*, 15-cr-00111 (W.D. Pa. 2015). The guideline ranges for these cases were, typically, 6 to 12 months. *Id.* There is no record of Judges sending any to prison on their sentencing date. *Id.* Ten received terms of probation. One was sentenced to time served, with two years of supervised release. Two defendants were fugitives. *Id.* The records of two are sealed. *Id.*

     C. <u>Massachusetts</u>. The government in this District has also brought testing fraud cases before this one, including one in this Court.  In *United States v. Xinyan Wang*, 1:17-cr-10402-IT, the defendant used a counterfeit passport to take the GRE on behalf of another individual. *Id* (Doc. No. 16). The criminal complaint charged that the defendant had also acted as an imposter to take the TOEFL on five other occasions. The guidelines range was there, as here, 0 to 6 months. *See* Transcript of Sentencing (Document No. 30). At sentencing, the government said that, from its perspective "it would make no difference whether the object of the fraud was to cheat on the TOEFL, the GRE, or the SAT." *Id.* at 10. The Court then inquired:

> THE COURT: Okay. Let's imagine it was just the GREs she had done. And, typically, for the GREs, you will typically have American citizens taking the exam, and you will still sometimes have fraudulent participation in the test taking. More likely, the person would use a driver's license probably. I don't know what their documentation -- the fake ID would not necessarily be a passport or a visa.
>
> COURT: Does the crime seem different or the same?
>
> THE GOVERNMENT: Absolutely worse.

 *Id.* at 11. In *Wang,* The government recommended a three month prison sentence. *Id.* at 18. The Court imposed a one-year term of probation. *Id.* at 35.

     This Court's sentence in Wang was consistent with the sentences recently imposed in other test fraud cases in the District. *See United States v. Huang*, 17-cr-10255-FDS (defendant paid an imposter to take the TOEFL on her behalf to secure admission to Pennsylvania State University;

GSR: 6 to 12 months; sentence: time served (one-day)); *United States v. Cheng*, 17-cr-10225-DJC (defendant paid an imposter to take the TOEFL on her behalf to secure admission to Arizona State University; GSR: 6 to 12 months; sentence: time served (one-day)); *United States v. Zhang,* 17-cr-10251-ADB (defendant paid an imposter to take the TOEFL on her behalf to secure admission to Northeastern University; GSR: 6 to 12 months; sentence: time served (one-day)); *See United States v. Yue Wang*, 17-cr-10237-RWZ (defendant test taker posed as three individuals to take TOEFL on their behalf; GSR: 6 to 12 months; sentence: time served (one-day)).

*5. Other Relevant Sentences in this District.* In *United States v. Vandemoer*, 19-cr-10079-RWZ, the only other so-called Varsity Blues case where sentence has been imposed, Judge Zobel rejected the government's request that a defendant who pleaded guilty to racketeering conspiracy in violation of 18 U.S.C. 1962 (d) be sentenced to prison for 13 months. Doc. No. 21. In that case, the Court concluded that the applicable guideline range was 27 to 33 months. Doc. No. 29. But the Court imposed a time served (one day) sentence, with two-years' supervised release and six months' home confinement, not incarceration. Doc. No. 29.

### C. A Probationary Sentence Would Constitute "Just Punishment."

While the so-called Varsity Blues cases share common features, imposing an individual-ized sentence requires careful attention to Ms. Huffman's conduct in light of the government's allegations against *all* the charged defendants. To be clear, Ms. Huffman does not seek to justify, excuse or minimize what she did. But disciplined examination of the facts reveals that Ms. Huff-man's conduct (though certainly wrong and illegal) did *not* involve a number of the aggravating factors the government has alleged apply to other defendants. The critical distinctions are these:

1. *Ms. Huffman Did Not Seek Out Singer to Falsify Her Daughter's Test Results.* The government alleges that some parents approached Singer knowing that he would falsify test results or create phony athletic profiles in exchange for money. PSR ¶ 22. Ms. Huffman did not.

2. *Ms. Huffman Did Not Enlist Her Daughter in Criminal Conduct.* Some parents involved their own children in criminal conduct by having proctors take exams in their place, or by having those proctors provide the correct answers when the test was taking place. *Id.* ¶ 28(c). Ms. Huffman did not.

3. *Ms. Huffman Did Not Falsely Describe her Daughter as Having Learning Disabilities.* The government alleges that other defendants had "their children purport to have learning disabilities in order to obtain the medical documentation [testing agencies] typically require before granting students extended time." *Id.* ¶ 28(a). Ms. Huffman did not.

4. *Ms. Huffman Said "No" to Singer's Proposal to Falsify on Her Younger Daughter's SATs.* The government alleges that other parents repeated their criminal conduct by using (or agreeing to use) Singer to commit fraud more than once. Ms. Huffman did not.

5. *Ms. Huffman Did Not Pay Singer to Take Classes for Her Daughter.* The government alleges that some defendants paid Singer to take college classes for their children. *Id.* ¶ 20. Ms. Huffman did not.

6. *Ms. Huffman Did Not Falsify Information About Her Daughter's Race, Ethnicity, and Extracurricular or Athletic Activities.* The government alleges that, in many of these cases, parents falsified information about their children's race, ethnicity, or extracurricular activities. *Id.* Ms. Huffman did not.

7. *No Parent Paid Less to Singer than Ms. Huffman.* Of the 43 parents charged in the original complaint in this case, Ms. Huffman was one of three parents who paid Singer the least ($15,000) to participate in his scheme.

8. *Ms. Huffman Promptly Accepted Responsibility and Expressed Genuine Regret for Her Actions.* Ms. Huffman recognized that what she did was wrong from the start. After her arrest, she did not seek to minimize her actions or make excuses for them.

18

### D.  A Probationary Sentence Would Provide Adequate Deterrence and Promote Respect for the Law.

18 U.S.C. § 3553(a)(2)(B) requires the Court to consider whether a sentence would "afford adequate deterrence to criminal conduct" and "promoted respect for the law." The sentence Ms. Huffman proposes would do both. First, a federal felony conviction, coupled with a term of probation and a condition requiring significant community service, constitutes substantial punishment, particularly where a non-incarceration sentence is by far the most typical sentence imposed in similar circumstances. The Supreme Court recognized in *Gall v. United States*, 552 U.S. 38, 48-49 (2007) that probation supervision "is not an act of leniency" but "substantial restriction of freedom" (quoting sentencing judge). As the Supreme Court observed, while

> custodial sentences are qualitatively more severe than probationary sentences of equivalent terms offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U. S. 112, 119 (2001) ('Inherent in the very nature of probation is that probationers "do not enjoy the absolute liberty to which every citizen is entitled"'(quoting *Griffin v. Wisconsin,* 483 U. S. 868, 874 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG §5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court.

*Id.*  This sentiment has been echoed by other Judges in the District of Massachusetts. As Judge Gertner observed in one of the first sentencing hearings conducted in this District after *Gall*:

> *Gall* recognized for the very first time in a very long time that probation is not nothing, that there are substantial restrictions on an individual's freedom in probation, that we can structure a probationary sentence that meets all the purposes of sentencing, and that is entirely appropriate.

*United States v. Ramos*, No. 04-cr-10275-NG (D. Mass. 2008) (ordering probationary sentence for substantial OxyContin trafficking where guidelines range was 37-46 months). Judge Stearns' observations at sentencing in *United States v. Prosperi,* 686 F.3d 32 (1ˢᵗ Cir. 2012) also deserve attention:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

*Id*. at 43-44 (upholding a sentence of probation with six months' home confinement and 1,000 hours of community service where the District Court calculated the guidelines range as 87 to 108 months.)

The Court does not have to send Ms. Huffman to prison to deter others from engaging in similar criminal conduct. Ms. Huffman's experience here (which, to be clear, she recognizes she brought on herself) is nothing anyone would bargain for given the consequences she has *already* faced. She was arrested at home by FBI agents who entered her teenage daughters' bedrooms and woke them at gunpoint. She immediately became part of a major public spectacle. Her sole motive in committing this crime was to clear the way for Sophia to be able to compete for admission at performing arts schools based on her acting ability. But the result was precisely the opposite: Sophia will not be going to college next year at all. Exhibit D, Tab 1 (William Macy Letter). Even schools that do not require the SATs declined to permit her to audition after her mother's arrest. Ms. Huffman is working hard to heal the divisions in her family, but her daughters remain deeply angry at her, and she must live day to day with the shame that she has tarnished their name as well

as her own. *Id.* Ms. Huffman does not know when she will work again, or if she will at all. She has received not a single offer or audition since her arrest. *Id.*

Ms. Huffman recognizes that the consequences her actions brought about are in most respects no different than many defendants this Court sentences. But they are real. The vast majority of defendants in her guidelines range are not sentenced to prison. General deterrence is not a sufficient justification to treat Ms. Huffman differently.

### E.  Ms. Huffman's Crime Represents a True Aberration from Her Life; Consideration of the Ms. Huffman's "History and Characteristics" Makes a Probationary Sentence Appropriate Here.

The PSR, and the 28 letters submitted with this Memorandum, provide a compelling picture of Ms. Huffman's background and character. The PSR describes Ms. Huffman's background. While Ms. Huffman did not face the kind of privation that many defendants sentenced in this Court face, her childhood was far from storybook. *See* PSR ¶¶102-105. The letters provide the best picture of who Felicity Huffman truly is. They are remarkable for the consistent way they describe Ms. Huffman's character. No brief summary can do justice to the *depth* of feelings the letters convey, and this summary is not intended as a substitute for the letters themselves. But three major themes run through the letters.

First, the letters describe a woman with an enormous heart, who demonstrates extraordinary kindness and a spirit of generosity to people who are struggling and need help. And she does not just *talk* about helping; she shows up. Friends, neighbors, co-workers, and strangers—all bear witness to this. This is a trait she has exhibited since she was young. A few examples convey the picture. As a young woman, and at time when the AIDs epidemic was poorly understood, she became a primary caretaker for a family friend and fellow actor, Ray Underwood, who was dying in Los Angeles. As Ray's brother Val Underwood describes:

Ray was a victim of the AIDS epidemic of the late 80's and early 90s. Ray was well loved by many, but when he became ill the large majority of his friends disappeared. . . . Felicity was one of that handful who formed Ray's care team. At that point in her life, she was a young, vibrant actress with a promising career and surely could have chosen other ways to spend her time. This was also a time when HIV infection was not fully understood and surrounded by fear. Yet whenever Felicity was needed, she would make herself available to relieve me as his principle caregiver. . . . On one of the worst evenings of my life, I asked Felicity to stay with Ray while I went to a consultation with one of his doctors to learn that he had contracted an opportunistic brain virus.

*See* Exhibit D, Tab 4 (Val Underwood Letter); id., Tab 5 (Betsey Huffman Letter).

Friends know they can count on Ms. Huffman. Laura Bauer, whom Ms. Huffman has known since the 1990s, describes how Ms. Huffman responded when she learned that Ms. Bauer had been in a freak accident in a New York convenience store:

I fell a full story and landed on my head, bit through my tongue, and knocked all my teeth loose. The stage manager, went down the ladder, picked me up and carried me out of the establishment and home 2 blocks. When he arrived he got me settled and despite it being 2:00AM, he called Flicka. That's her nickname. When you are shaken up, when it is the middle of the night, when you are hurt, you can call Flicka. He told her what had happened, she yelled at him for moving me, cancelled her trip and met us at the hospital. The following period of recovery for me was very difficult. She advocated for me with doctors, spread the word to friends that I needed care and support and was there for me until I was stabilized and on my way to health.

*Id.*, Tab 4 (Laura Bauer letter). Another long-time friend, Kate Blumberg, writes:

Somehow Felicity got wind of the fact that I was struggling, that I wasn't well, that I wasn't coping. At this time, I was living in New York, and Felicity had long ago moved to Los Angeles. Out of the blue, I received a phone call from her to inform me that she would be stopping by. Before I knew it, she was at my apartment building. She came into my apartment and saw me still in my pajamas in the middle of the day. She sat on the bed with me, never pressuring me to get up, but rather just sat there listening while I spoke of my pain. As I am typing this, I am crying remembering that moment. She became my lifeline. She shared her personal experiences of going through a similar time, she gave me advice, guidance, support.

B5037375.3

*Id.* Tab 5 (Kate Blumberg Letter). Later, when Blumberg and her family moved to Los Angeles, "Felicity and Bill opened their house to us and we lived with them for 6 months. When we finally moved into our house in Los Angeles, she showed up one day with metal shelving units and cleared out my garage and configured it into a playroom for my kids." *Id.* (Todd Weeks letter).

People *without* long histories with Ms. Huffman recite similar stories. Ellen Etten, whom helped Ms. Huffman with childcare, describes how she was treated: "What I met with was the warmest, kindest, most loving environment I've ever experienced." *Id.* Tab 6 (Ellen Etten Letter). Huffman immediately made her feel that she "was part of the family." *Id.* A local actor Ms. Huffman worked with on a film in Oklahoma describes how Ms. Huffman reacted when the state was met with devastating tornado:

> We picked up Felicity and loaded up items she had purchased earlier that day. Diapers, women's products, cleaning supplies, water from Felicity were all loaded up . . . and then we drove down to Moore, Oklahoma.
>
> One elderly woman sat in a lawn chair crying, as she lost her cat in the storm. This cat was all she had left in life, on top of losing her home. Felicity kneeled down with her, hugged her and cried with her. This woman had no idea who she was at the time other than she seemed like a typical Oklahoman, there to help. And that day, Felicity was. We moved from rubble to rubble, helping and hugging, and suddenly Felicity heard a sound in an old pickup. She said that it sounded like an animal was trapped or inside. We looked under the seat and there was a cat. She looked up at me and the owner of the truck, 'what if that's her cat.' It was. Felicity brought more than just joy with her that day. I watched as she walked the shaking feline down the torn-up sidewalk back to the older woman still sitting wondering what to do next. Tears flowed from everyone as the woman hugged her cat again.

*Id.* Tab 7. (Lucas Ross Letter).Two letters describe Ms. Huffman at work. Marc Cherry, the creator of *Desperate Housewives*, where Ms. Huffman was part of the cast for nine years, describes Ms. Huffman on the set. *Id.* Tab 8 (Marc Cherry Letter). In one revealing anecdote, he describes how Ms. Huffman worked with an older actress who was struggling. As he writes:

23

> [When] I saw the dailies it moved me to tears—this formerly great performer was struggling with practically every word. But Felicity Huffman was right next to her, treating her with so much kindness. Gallantly throwing her cues and gently reminding her which lines to move on, etc. Take after take it went on. The actress, who was in her seventies, started becoming increasingly flustered and embarrassed at her inability to do her job.  But Felicity remained patient and supportive and helped this old woman through the day, turning what could have been a very tense situation into a master class on human compassion.

 Another actress on the show—the least experienced actress of the five "Housewives," describes how "[w]hen I began the TV show, I was very new to the business and industry as a whole.  Felicity was the first one to take me under her wing . . . to a young, naïve, Mexican girl who felt like I didn't belong, those gestures meant the world to me.  She mattered." *Id.* Tab 9 (Eva Longoria Baston letter).

Ms. Huffman's family has seen her compassion more often than anyone else. She has consoled a sister through the death of a son, helped another address the death of her closest sister, and helped nieces and nephews battling depression or seeking career advice. *Id.*  Tab 10 (Isabel Belden Letter); Tab 11 (Grace Huffman Letter), Tab 12 (Jessie Huffman Letter); Tab 13 (Joseph Huffman Letter.)

A second theme emerges from the letters. Ms. Huffman has displayed a deep and abiding commitment to the causes she has championed. Ms. Huffman knew little about LACHSA, the public performing arts school that draws a diverse group of students from all over Los Angeles, until Sophia began attending. But when she learned of the kind of help the school needed, she jumped in with both feet. As LACHSA's former principal writes, Ms. Huffman "could be counted on to roll up her sleeves" to support the school, "serving dinners during tech week and performance nights . . . striking the scenery/sets and even cleaning the bathrooms after the show." *Id.* Tab 14 (Mitzi Lizarraga Letter). The co-President of the LACHSA's charitable foundation writes: Ms.

Huffman "approached this work like it was her second job, volunteering countless hours of her time, devoting her creative energy, sharing her professional expertise, and generously supporting the school in other ways." *Id.* Tab 15 (Stella Jeong Letter). Ms. Huffman and her husband "taught master classes [and] had students over to their house to rehearse." *Id.* She, too, describes Ms. Huffman "as down to earth as they get . . a roll-up-her-sleeves-and-get-it-done kind of person who loved to get into the weeds." *Id.* Ms. Huffman and her husband also provided—and called on their friends and contacts to provide—financial support for the school, organizing and hosting "four fundraisers (two in their own home) featuring extraordinary student performance and exhibitions." *Id.* These fundraisers raised more than "$1 million to be used in exclusively in support of LACHS students' and their education." *Id.* Tab 14 (Mitzi Lizarraga Letter). Through the school's foundation, Ms. Huffman also successfully spearheaded teacher salary raises for the part-time teaching artists in 2018-2019. *Id.*

Ms. Huffman's volunteer and fundraising work for LACHSA was nothing out of the ordinary for her. Over the years—and long before the charges were brought in this case—she has consistently answered the call when organizations she believes in have asked for her help. Year after year, for example, she has devoted time to raising awareness and money for cancer and women's health research, performing or serving as the keynote speaker at events, serving as a volunteer spokesperson, filming public service announcements and participating in telethons. *See* Murphy Affidavit, ¶5. She has played similar roles in efforts to raise funds for at-risk youth, class room teachers, homelessness, LGBTQ rights, Latina children, humanitarian relief, human rights campaigns, environmental initiatives, reproductive freedom, women's empowerment, and the "Time's Up" movement. *Id.* ¶6. *See also* Exhibit D (Tab 9) (Eva Longoria Baston Letter).

One final theme emerges. The letters leave no doubt about Ms. Huffman's devotion as a mother. But they also show that she has also found being a parent extraordinarily challenging— "bewildering" as she herself describes it. Exhibit A. Daniel and Benjamin Barnz, former neighbors whose daughter and son often played with Ms. Huffman's daughters, describe Ms. Huffman involvement in the children's "baking, fort-making, gardening [and] scavenger hunts." Exhibit D (Tab 16). But they also write: "In private conversations, Felicity was very open about the trials and tribulations of parenting.  She was often self-critical when it came to her skills as a parent; in our opinion, unfairly so. "Another parent who met Ms. Huffman as an elementary school mother writes that Ms. Huffman "was the mom on the playground actively playing with the kids: chasing them, pushing them on the swing, taking turns on the slide with them." *Id.* Tab 17 (Amelia Hamilton Letter). But Ms. Hamilton writes that "she was also struck by how open she was about the challenges of motherhood. We would often talk about how wonderful AND hard it was at the same time." *Id.* Ms. Huffman's letter candidly describes her insecurity about motherhood. Exhibit A. William Macy writes about how Ms. Huffman "read a book called 'The Gift of a Skinned Knee' and was so impressed by the author, Wendy Mogul, she made it her quest to meet Ms. Mogul and talk to her about raising children." *Id.* Tab 1.  (William Macy Letter). Over six years, Ms. Huffman sought Ms. Moguls' professional help to guide her as a parent, "never focused on the status aspects or social opportunities but rather worked to discern the best match for each her daughter's true interests, abilities and challenges." *Id.* Tab 18 (Wendy Mogel Letter).

In this case, Ms. Huffman's lack of confidence about her abilities as a mother became her Achilles heel. When Singer proposed his scheme, Ms. Huffman abandoned her inner sense of right and wrong, gave way to her doubts and uncertainties, and made the wrong decision. The letters

before the Court, which attest to her "history and characteristics," show that she will never make a choice like that again.

### F.  Ms. Huffman's Proposed Community Service Placements.

The guidelines authorize the Court to impose community service as a special condition of probation. *See* USSG §5F1.3. Ms. Huffman asks the Court to order 250 hours of community service as a special condition of probation. Sentencing Judges sentencing defendants in Ms. Huffman's guideline range do not commonly order community serve as a special condition of probation. [15] When Judges do order community service, they do not typically require defendants to perform as many as 250 hours. *Id.* Here, however, it would represent a meaningful aspect of sentencing and punishment—certainly more beneficial than sending Ms. Huffman to prison.

Subject to the approval of the Probation Department, Ms. Huffman proposed to serve any community service the Court orders with two Los Angeles organizations: the Teen Project and the Community Coalition. Murphy Aff. ¶7. Both serve at risk-youth in the Los Angeles area. *Id.* The Teen Project, *see* http://theteenproject.com/, operates an addiction recovery program for teenagers aging out of the foster care system. *Id.* If approved by the Court and the Probation Department, Ms. Huffman would work onsite at the program, helping the project's residents progress through their individualized recovery plans, supporting the organization's efforts to provide job skills training and helping residents obtain high school equivalency certifications. *Id.* The Community Coalition, among other things, works to increase college matriculation and disrupt the school to prison

---

[15] Of the 127 similar Massachusetts cases cited above, see Exhibit C (Table D) Judges imposed community service in nine. Seven of those nine defendants received 250 hours or fewer of community service; two received 400 hours. Nationally, of the 13,858 defendants sentenced to probation, 2,970 (16%) were ordered to perform community service as special condition of probation. *Id.* (Table B). More than 90% of these defendants were ordered to perform fewer than 200 hours of community service. *Id.*

pipeline. *See http://cocosouthla.org/*. If approved, Ms. Huffman would tutor young people, assist with financial aid applications, answers phone calls at the front desk, and help with the organization's outreach efforts. Both organizations have agreed, if approved, to report on Ms. Huffman's participation to Probation. Having Ms. Huffman perform community service with disadvantaged youth would be a fitting and proper way for her to pay for the crime she committed..

## VI.      CONCLUSION

Ms. Huffman is deeply remorseful for her crime. She recognizes that she deserves to be punished for what she did. 18 U.S.C. §3553(a) calls for the Court to impose a sentence that is "sufficient, but not greater than necessary" to serve the purposes of sentencing.  The sentence proposed here does exactly that.

Respectfully submitted,

FELICITY HUFFMAN
By her attorneys,


*/s/ Martin F. Murphy*
Martin F. Murphy BBO # 363250
Julia Amrhein BBO # 684912
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
Telephone: 617-832-1000
Facsimile: 617-832-7000
mmurphy@foleyhoag.com
jamrhein@foleyhoag.com

DATED: September 6, 2019

B5037375.3

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 6th day of September 2019.

_Martin F. Murphy_____

Martin F. Murphy